UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CATHERINE JOHNSON, *as estate representative*
*of the estate of Stella Trbovich, deceased,*

Plaintiff,

v.

**DECISION AND ORDER**
06-CV-418S

MICHAEL O. LEAVITT, *as Secretary of the*
*Department of Health and Human Services,*

Defendant.

## I. INTRODUCTION

Plaintiff appeals Defendant's final decision denying Medicare Part A coverage for two months of care provided to her mother, Stella Trbovich, at the Canterbury Woods Nursing Home. Presently before this Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1] This Court has authority to review Defendant's final decision pursuant to 42 U.S.C. § 1395ff(b)(1)(A). For the reasons that follow, Defendant's motion is granted and Plaintiff's is denied.

## II. BACKGROUND

### A.    Facts

Stella Trbovich was 89 years old when she was admitted to Millard Fillmore Suburban Hospital on June 8, 2000, due to weakness, dizziness, and difficulty standing.

---

[1]Defendant filed his motion on December 29, 2006, accompanied by a memorandum of law. (Docket Nos. 6, 7.) Plaintiff responded with a cross-motion and memorandum of law on January 31, 2007. (Docket Nos. 9, 10.) Defendant filed a reply memorandum of law on February 12, 2007, at which time this Court took the motions under advisement without oral argument. (Docket No. 12.)

(R. at 299.[2])  She had excessive leg-shaking, slurred speech, a urinary tract infection, and was unable to walk.  (R. at 299.)  She also had a history of dementia, and at the time of admission was oriented only to person.  (R. at 299.)  After receiving a brief course of treatment, Trbovich was discharged from Millard Fillmore on June 22, 2000, and admitted to Canterbury Woods, a skilled-nursing facility, for long-term care.  (R. at 206, 299.)

Upon her admission to Canterbury Woods, Trbovich was examined by Dr. Carolyn Warner, who found orthostatic hypotension, dementia, and possible vertebral basilar insufficiency.  (R. at 206.)  She was also evaluated by occupational therapist Donald Agliata[3] for occupational and physical therapy.  (R. at 386, 389.)  Trbovich received both occupational and physical restorative therapy services 5 days per week beginning on June 22, 2000.  (R. at 389-90.)

But about a month later (on July 21, 2000), Agliata discharged Trbovich from restorative occupational therapy and placed her on a 3-day-per-week maintenance program because she had reached her maximum recovery.  (R. at 390-92.)  At approximately the same time (July 18, 2000), Trbovich was also discharged from restorative physical therapy and placed on a 2-day-per-week maintenance program.  (R. at 392-93).  Restorative physical therapy was discontinued because Trbovich had achieved her maximum rehabilitative potential.  (R. at 393.)

Based on the determination that Trbovich reached her maximum rehabilitative potential, Canterbury Woods notified Trbovich's husband that beginning July 22, 2000,

---

[2]Citations are to the administrative record, which Defendant filed with his Answer.  (Docket No. 5.)

[3]Agliata testified at the hearing before the ALJ.  (R. at 386-394.)

Trbovich no longer qualified for Medicare coverage.  (R. at 330-31.)  Trbovich's husband appealed this determination, and Trbovich remained at Canterbury Woods.  (R. at 331.)

On July 18, 2000, Dr. Stanley L. Bukowski examined Trbovich at Canterbury Woods.  (R. at 181.)  He noted "some dependent edema . . . [s]tands and transfers with two, ambulates in therapy."  (R. at 181.)  He further noted that Trbovich's behavior was "okay," that she was alert and pleasant, but disoriented.  (R. at 181.)  There was no evidence of congestive heart failure.  (R. at 181.)  Dr. Bukowski ordered that Trbovich be observed for a decrease in appetite and to see how she tolerated a decrease in her Risperdal dose.  (R. at 181.)

Dr. Bukowski visited Trbovich again on August 8, 2000, at which time he found her to be alert, pleasant, and cooperative, but confused.  (R. at 180.)  He noted that her ears needed to be flushed (which they were), that she had a blister on her buttock, and that she had "1+ edema at the tops of her socks."  (R. at 180.)  Trbovich's vascular dementia and degenerative joint disease were unchanged, and her depression was "doing well with Prozac."  (R. at 180.)  Dr. Bukowski ordered that Trbovich continue to be observed relative to a further reduction in her Risperdal dose.  (R. at 180.)

Dr. Bukowski returned again on September 19, 2000, and noted that Trbovich was alert and smiling, and that her "behavior has been good overall."  (R. at 179.)  He found that the Prozac continued to keep good control over Trbovich's depression symptoms, but she still was very confused and disoriented.  (R. at 179.)  He also noted that she was incontinent and needed assistance with eating.  (R. at 179.)  Trbovich's vascular dementia remained unchanged, her ambulation had improved significantly, and she was using a rolling walker with only one assist.  (R. at 179.)

3

**B.     Administrative Proceedings**

Trbovich's request for Medicare coverage for her care between July 24 and September 27, 2000, was denied at all administrative levels.  She then requested a hearing before an Administrative Law Judge ("ALJ"), which took place on June 23, 2005.  (R. at 381-403.)

On September 1, 2005, the ALJ issued a written decision denying Trbovich's request for Medicare coverage.  (R. at 11-17.)  He found that Plaintiff is liable for the costs incurred from July 24, 2000, through September 27, 2000, because Trbovich received care that did not meet the legal requirements of the Medicare regulations.  (R. at 17.)

Plaintiff appealed the ALJ's decision to the Medicare Appeals Council, which denied her request for review on April 28, 2006.  (R. at 1-2.)  The ALJ's decision therefore became Defendant's final decision in this matter.  See 42 C.F.R. § 405.730.  Plaintiff filed the instant challenge to Defendant's final decision on June 26, 2006.

## III. DISCUSSION

**A.     Statutory Framework[4]**

Medicare is a medical insurance program for the aged and disabled.  It provides hospital insurance coverage and voluntary supplemental medical insurance benefits.  See 42 U.S.C. §§ 1395-1395gg.  The program is administered by the Center for Medicare & Medicaid Services, which is a component of the U.S. Department of Health and Human Services.

---

[4]This section tracks the statute, as well as Judge Feurstein's discussion of the Medicare program as set forth in Frohnhoefer v. Leavitt, No. 06-CV-1236, 2007 WL 841917, at *1-*2 (E.D.N.Y. Mar. 19, 2007).

Medicare Part A is the hospital insurance program.  It covers certain care delivered at hospitals, skilled-nursing facilities, hospice, and the like.  <u>See</u> 42 U.S.C. §§ 1395c-1395i-5.  To receive coverage for post-hospital, skilled-nursing care, the beneficiary must have been an inpatient in a qualifying hospital for at least 3 consecutive calendar days (not including the day of discharge), and must have been discharged in or after the month the beneficiary became eligible for Medicare.  <u>See</u> 42 C.F.R. § 409.30(a).  The beneficiary must also need post-hospital, skilled-nursing care, be admitted to a skilled-nursing facility, and receive skilled-nursing care within 30 days of the date of hospital discharge.  <u>See</u> 42 C.F.R. § 409.30(b)(1).

Medicare covers up to 100 days of post-hospital, extended-care services during any spell of illness.  <u>See</u> 42 U.S.C. § 1395d(a)(2)(A).  A spell of illness is a period of consecutive days beginning with the first day (not included in a previous spell of illness) on which the beneficiary receives inpatient hospital services, inpatient critical-access hospital services, or extended-care services, and which occurs in a month for which the beneficiary is entitled to benefits under Part A.  <u>See</u> 42 U.S.C. § 1395x(a)(1).  The spell of illness ends with the close of the first period of 60 consecutive days thereafter in which the beneficiary is neither an inpatient of a hospital or critical-access hospital, nor an inpatient at a skilled-nursing facility.  <u>See</u> 42 U.S.C. § 1395x(a)(2).

For Medicare to pay the costs of post-hospital, extended-care services, a physician, nurse practitioner, or clinical nurse specialist must certify and recertify that the beneficiary needs daily skilled nursing or rehabilitative care for the condition for which the beneficiary previously received inpatient hospital services.  42 U.S.C. § 1395f(a)(2)(B).  A covered skilled service is one that (1) is ordered by a physician; (2) requires the skills of technical

or professional personnel; and (3) is furnished directly by or under the supervision of such personnel.  <u>See</u> 42 C.F.R. § 409.31(a).  These services must also be needed and provided on a daily basis.  <u>See</u> 42 C.F.R. §§ 409.31(b), 409.34(a)(1).  Additionally, the "daily skilled services must be of the type that, as a practical matter, can only be provided in a [skilled-nursing] facility, on an inpatient basis." 42 U.S.C. § 409.31(b)(3).  Skilled-nursing services include the following:

>    (1) intravenous or intramuscular injections and intravenous feeding;
>
>    (2) enteral feeding that comprises at least 26 percent of daily calorie requirements and provides at least 501 milliliters of fluid per day;
>
>    (3) nasopharyngeal and tracheostomy aspiration;
>
>    (4) insertion and sterile irrigation and replacement of suprapubic catheters;
>
>    (5) application of dressing involving prescription medications and aseptic techniques;
>
>    (6) treatment of extensive decubitus ulcers or other widespread skin disorder;
>
>    (7) heat treatments which have been specifically ordered by a physician as part of active treatment and which require observation by nurses to adequately evaluate the patient's progress;
>
>    (8) initial phases of a regimen involving administration of medical gases; and
>
>    (9) rehabilitation nursing procedures, including the related teaching and adaptive aspects of nursing, that are part of active treatment, e.g., the institution and supervision of bowel and bladder training program.

42 C.F.R. § 409.33(b).

6

Medicare excludes from coverage "custodial care" and items and services that are not medically reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A), (9).  Custodial care is care that does not qualify as skilled-nursing care.  42 C.F.R. § 411.15(g).  For example, personal-care services such as administration of routine oral medications; assistance in dressing, eating, and toileting; periodic positioning in bed; routine care of incontinent patients; and the general supervision and carrying out of maintenance programs are not covered.  See 42 C.F.R. §§ 409.33(d), 411.15(g).

But overall management and evaluation of a care plan involving personal-care services may constitute skilled services when the patient's condition requires the involvement of technical or professional personnel.  See 42 C.F.R. § 409.33(a)(1)(I). Moreover, observation and assessment by technical or professional personnel may constitute skilled service when such skills are required to identify the beneficiary's need for modification of treatment or for additional medical procedures.  See 42 U.S.C. § 409.33(a)(2).

Finally, Medicare has a "limitation on liability" provision that protects a beneficiary from liability for services that he or she could not reasonably be expected to know were not covered by Medicare.  42 U.S.C. § 1395pp(a).  But a beneficiary is deemed to have knowledge that certain services are not covered by Medicare if written notice of non-coverage is provided.  See 42 C.F.R. § 411.404(b).

**B.    Standard of Review**

A decision by the Secretary of Health and Human Services on Medicare coverage is conclusive if free from legal error and supported by substantial evidence in the record. See Hurley v. Bowen, 857 F.2d 907, 912 (2d Cir. 1988).  Substantial evidence is simply

"more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  In reviewing the Secretary's decision, courts look at the whole record, considering both the evidence that supports the Secretary's decision, and that which detracts from it. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).  Thus, the Secretary's decision will be disturbed only if there is a lack of substantial evidence or legal error.  Pfalzgraf v. Shalala, 997 F.Supp. 360, 363 (W.D.N.Y. 1998).

The Second Circuit has directed that an individual's need for skilled nursing care should be informed by two principles.  First, "the decision should be based upon a common sense, non-technical consideration of the patient's condition as a whole." Friedman v. Sec'y of the Dep't of Health & Human Svcs., 819 F.2d 42, 45 (2d Cir. 1987).  Second, "the Social Security Act is to be liberally construed in favor of beneficiaries." Id.  Nevertheless, the claimant has the burden of proving entitlement to Medicare benefits. See id. (citing Morton v. Heckler, 586 F.Supp. 110, 111 (W.D.N.Y. 1984)).

## C.   Analysis

The ALJ determined that beginning on July 24, 2000, treatment in a skilled nursing facility was not reasonable and necessary for the diagnosis or treatment of Trbovich's illness or to improve the functioning of a malformed body member.  (R. at 11-17.)  In particular, the ALJ found that from July 24, 2000, through September 27, 2000, Trbovich received custodial care (not skilled-nursing care), and thus did not meet the requirements of the Medicare regulations.  (R. at 17.)  Consequently, the ALJ held that payment could not be made on Trbovich's behalf to Canterbury Woods under Medicare Part A, and that Plaintiff is therefore liable for that cost.  (R. at 17.)

1.      **The ALJ Did Not Apply the Wrong Legal Standard or Improperly Rely on the Opinions of Trbovich's Treating Physician and Therapists**

Plaintiff first argues that the ALJ erred by accepting Dr. Bukowski's opinion that the services Trbovich received between July 24 and September 27, 2000, were not covered by Medicare.  In a letter dated July 13, 2002, Dr. Bukowski stated that after July 21, 2000, Trbovich did not need skilled nursing services for assessment, observation, or restorative treatments.  (R. at 62.)  Plaintiff maintains that the ALJ committed legal error by accepting Dr. Bukowski's opinion, rather than applying the relevant Medicare regulations.

Although Plaintiff recognizes that a treating physician's opinion is significant, she argues that Dr. Bukowski is incorrect.  Plaintiff maintains that her physical and occupational maintenance program qualifies for coverage under 42 C.F.R. § 409.32, which provides that skilled services may be required to prevent deterioration or preserve current capabilities, even if an individual's full restorative potential has been reached.  She further maintains that the services she received should be covered under 42 C.F.R. § 409.33(a)(1), as overall management of her care, and 42 C.F.R. § 409.33(a)(2), as observation and assessment of her changing condition.

But contrary to Plaintiff's argument, the ALJ did not rely solely on Dr. Bukowski.  He also considered Dr. Bukowski's (and others') treatment notes.  Moreover, he considered the Medicare regulations cited above, discussed them in his decision, and found that the care Trbovich received did not qualify for coverage under any of them.  (R. at 13-17.)  In this Court's view, the ALJ placed appropriate weight on Dr. Bukowski's findings, as well as the determinations of the physical and occupational therapists that Trbovich had reached her maximum rehabilitative potential.  (R. at 16.)  Nowhere in the record is there any

evidence that Trbovich needed the care and attention of *skilled* personnel on a daily basis to manage her physical and occupational maintenance programs, oversee her care, or observe her changing condition.  To the contrary, Trbovich received classic custodial care: administration of routine oral medications (R. at 179-81); assistance in eating and toileting (R. at 179); routine care of incontinent patients (R. at 179); and the general supervision and carrying out of maintenance programs (R. at 390-93).  <u>See</u> 42 C.F.R. §§ 409.33(d), 411.15(g).

Consequently, this Court finds that the ALJ applied the correct legal standard and properly relied on the medical opinions of Trbovich's treating physician and treating therapists to reach the conclusion that Trbovich's condition did not require skilled-nursing care.

### 2.    The ALJ Properly Considered Trbovich's Condition as a Whole

Plaintiff's second argument is that the ALJ failed to consider Trbovich's condition as a whole, as required by governing case law.  <u>See</u>, <u>e.g.</u>, <u>Friedman</u>, 819 F.2d at 45, <u>Pfalzgraf</u>, 997 F.Supp. at 367.  This Court is not persuaded.  In fact, this particular ALJ is intimately familiar with the totality of Trbovich's condition, having previously presided over and granted coverage for an earlier time period at Canterbury Woods.  (R. at 12.)

Plaintiff argues that Trbovich's condition as a whole — including her age, dementia, and physical ailments — necessitated daily skilled-nursing services.  But the record does not bear this out.  Trbovich's own medical team reached the conclusion that skilled care was no longer necessary after July 21, 2000.  And although Trbovich's medical records and progress notes indicate that she was receiving extensive care, nothing therein

suggests that her treatment ever rose to the level of *skilled* care, as defined in the Medicare regulations.  In this Court's view, the medical notes and records support the ALJ's determination that after July 21, 2000, Trbovich's needs were met with custodial care, which is not covered by Medicare Part A.  Consequently, this Court finds no error in the ALJ's decision on this point.

### IV. CONCLUSION

Having thoroughly reviewed the administrative record, this Court finds that the ALJ's decision denying Plaintiff's request for Medicare Part A coverage for Trbovich's care at Canterbury Woods from July 24, 2000, through September 27, 2000, is supported by substantial evidence in the record.  Defendant's Motion for Judgment on the Pleadings is therefore granted.  Plaintiff's motion seeking the same relief is denied.

### V.  ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Judgment on the Pleadings (Docket No. 6) is GRANTED.

FURTHER, that Plaintiff's Cross Motion for Judgment on the Pleadings (Docket No. 9) is DENIED.

FURTHER, that the Clerk of the Court shall close this case.

SO ORDERED.

Dated:        September 23, 2007
              Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge

11